910 A.2d 406

CITY OF BALTIMORE DEVELOPMENT CORPORATION

v.

CARMEL REALTY ASSOCIATES, et al.

No. 14, Sept. Term, 2006.

Court of Appeals of Maryland.

Nov. 3, 2006.

**300**

302

Joshua N. Auerbach, Asst. Solicitor (Ralph S. Tyler, City Solicitor, on brief), Baltimore, for petitioner/cross-respondent.

John C. Murphy, Baltimore, for respondents/cross-petitioners.

Alice Neff Lucan, Washington, brief of The Maryland-Delaware-D.C. Press Assoc., for respondents, amici curiae.

James L. Thompson, Miller, Miller & Canby, Chartered, Rockville, William R. Maurer, Institute for Justice, Seattle, WA, brief of Institute for Justice, for respondents, amicus curiae.

Suzanne Sangree, Roscoe Jones, Jr., Francis D. Murnaghan, Jr., Appellate Advocacy Fellow, Baltimore, for Public Justice Center, amici curiae.

Deborah A. Jeon, David R. Rocah, American Civil Liberties Union of Maryland Foundation, Baltimore, for ACLU of Maryland, amici curiae.

Jonathan P. Guy, Kathleen A. Orr, Orrick, Herrington & Sutcliffe, LLP, Washington, DC, for ACLU of Maryland, amici curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This appeal arises from an action filed by Carmel Realty Associates, respondent,[1] alleging that the City of Baltimore Development Corporation (the "BDC"), petitioner, is subject to the requirements of both the Open Meetings Act[2] and Maryland's Public Information Act.[3] At the trial level, both parties moved for summary judgment. After hearing arguments on March 14, 2005, the Circuit Court for Baltimore City issued an Order denying Carmel Realty's motion and granting the BDC's motion. In an unreported opinion, filed January 24, 2006, the Court of Special Appeals reversed the ruling of the trial court and found that the BDC is subject to the requirements of both the Open Meetings Act and the requirements of Maryland's Public Information Act. The City of Baltimore Development Corporation filed a petition for a writ of certiorari on March 6, 2006, and Carmel Realty filed a cross-petition for a writ of certiorari on March 18, 2006. This Court granted both petitions on May 10, 2006. *City of Baltimore Development Corporation v. Carmel Realty Associates, et al.,* 392 Md. 724, 898 A.2d 1004 (2006).

The following questions are presented for review:[4]

1. There are nine respondents. Of those nine, seven own property within the affected area and two lease property within the affected area. We will refer to them collectively as "Carmel Realty" or respondent. When it is necessary to distinguish the individual respondents, the context will so indicate.

2. Maryland Code (1984, 2004 Repl.Vol.), §§ 10–501–10–512 of the State Government Article.

3. Maryland Code (1984, 2004 Repl.Vol.), §§ 10–602–10–628 of the State Government Article.

4. We have reworded the questions presented by the parties for the purposes of clarity. The questions that were presented by petitioner were originally worded as:
 "1. Is the Baltimore Development Corporation, a private not-for-profit corporation, subject to the Open Meetings Act, Md. Ann.Code, State Gov't §§ 10–501–10–512?
 "2. Is the Baltimore Development Corporation, a private not-for-profit corporation, subject to the Public Information Act, Md. Ann. Code, State Gov't §§ 10–601–10–628?"

1. Is the City of Baltimore Development Corporation a "public body" for the purposes of the Open Meetings Act?

2. Is the City of Baltimore Development Corporation an "instrumentality" of Baltimore City for the purposes of the Public Information Act?

3. If Carmel Realty is the prevailing party, is it entitled to attorney's fees as authorized by the relevant sections of the Open Meetings and the Public Information Acts?

We hold that the City of Baltimore Development Corporation is, in essence, a public body for the purposes of the Open Meetings Act and it is, in essence, an instrumentality of Baltimore City for the purposes of Maryland's Public Information Act. There has been no decision at the trial level regarding the issue of attorney's fees. Accordingly, we decline to address the issue. *See generally Stromberg Metal Works, Inc. v. University of Maryland,* 395 Md. 120, 909 A.2d 663 (2006).[5]

---

The question presented by respondent on his cross-petition for a writ of certiorari was originally worded as:

"If Carmel Realty is the prevailing party, is it entitled to attorney's fees as authorized by State Government Article 10–510 and 10–623?"

**5.** In the latter pages of Carmel Realty's brief, it urges us to declare that actions taken pursuant to the BDC's Board of Directors November 18, 2004 meeting are void because the BDC failed to comply with the relevant portions of the Open Meetings Act. We decline to do so because the issue is not properly before us.

At the trial level, respondent asked the Circuit Court for Baltimore City to void the BDC's Board of Directors meeting on November 18, 2004, presumably under § 10–510(d)(4) of the Open Meetings Act. The trial court never addressed this issue because it granted the BDC's motion for summary judgment, holding that the Open Meetings Act did not apply to the BDC. Carmel Realty placed the issue in the questions presented portion of its brief to the Court of Special Appeals and argued that the November 18, 2004 meeting should be voided. The intermediate appellate court, however, never addressed the issue in its unreported opinion. The precise issue of whether to void the meeting was not put directly before this Court in either the petition for writ of certiorari or the cross-petition for writ of certiorari. *See* Footnote 4, *supra.* We do note, however, that petitioner addresses it tangentially by urging us to remand issues that are not directly before us and that respondent urges us, in the latter pages of its brief, to void the meeting. In any event, the plain language of § 10–510(d)(4) prevents this Court

## I. Facts

### A. City of Baltimore Development Corporation

The City of Baltimore Development Corporation (the "BDC") was formed in October of 1991 with three members: Claude E. Hitchcock, Lyn W. Townsend, and Arnold Williams. The initial Board of Directors was composed of four individuals: William R. Brown, Jr., Honora M. Freeman, Robert W. Hearn, and Lynette W. Young.[6] The BDC is a not-for-profit corporation.

The BDC's stated purpose is:

from considering the issue because it has not been finally resolved at the trial level.

Section 10–510(d) provides in relevant part that:

"(d) *Authority of the court.*—A court may:

. . .

"(4) [I]f the court finds that a public body *willfully* failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of this subtitle and that no other remedy is adequate, declare void the final action of the public body; . . . ." (Emphasis added.)

Thus, under § 10–510(d)(4) of the Open Meetings Act, the decision of whether to void the action of a public body is *discretionary* upon a finding that the public body *"willfully"* failed to comply with one of the relevant provisions of the Open Meetings Act. Generally, discretionary findings which are reviewed by this Court are done so to determine whether the trial court abused its discretion. *Goodman v. Commercial Credit Corp.*, 364 Md. 483, 491–92, 773 A.2d 526, 532 (2001). As stated above, there was no finding by the trial court that, with respect to the November 18, 2004 meeting, the BDC *willfully* failed to comply with the relevant provisions of the Open Meetings Act. Thus, no discretion has been exercised by any court. The trial court's failure to address the issue resulted, not from an effort to avoid using its discretion, but instead, from its erroneous conclusion that the Open Meetings Act did not apply in the first instance. Thus, there is nothing on this issue for us to address in the posture of the case as it appears before this Court.

**6.** Although it is not clear, there is some indication in the record that the members may have been affiliated with the City of Baltimore at the time the BDC was initially formed and there are indications that at least three members of the Board of Directors were part of then-Mayor Kurt L. Schmoke's staff at the time. It is clear, however, that two other development corporations, Center City–Inner Harbor Development, Inc. and Baltimore Economic Development Corporation were merged into the BDC on the same day it was formed.

"(1) To develop and implement long-range development strategies for commercial, industrial, office, residential, and other development in the City of Baltimore (the 'City'); to serve as a liaison between the private and public sector to coordinate development efforts and to expedite the review of public approvals and other government services in the City; and to undertake any other appropriate activity to achieve the continued strong business climate, urban renewal, and development throughout the City;

"(2) To implement, oversee, and encourage public and private development and rehabilitation projects that will increase the City's tax base (by, among other things, assisting the City (and new and existing business) to finance new and expanding operations), provide permanent and temporary jobs (and job opportunities) in the City, and foster investment and confidence in the City's economy;

"(3) To enhance and improve the physical and cultural environment of the City through the creation of public open space, improved transportation systems, and the encouragement and creation of public attractions for local residents and visitors; to encourage cultural, entertainment, recreational, historic, and educational facilities that will further the promotion of the benefits of living in or visiting the City; to bring new spending power to the City's economy; to enhance and improve the image of the City as a place to live, work, and visit; and to encourage new residential initiatives in the City;

"(4) To improve the economic health of the City through attraction of new businesses, retention of existing businesses, and the stimulation and encouragement of growth and expansion of commercial office uses, manufacturing, warehousing, distribution, research, and development, including industrial application of new technologies, particularly in the medical and biotechnological spheres and 'space age' technologies with maximum growth potential;

"(5) To increase minority business enterprise and women's business enterprise participation in business and development activity;

"(6) To provide in the furtherance of these declared purposes, financing, financial assistance, and financial advice, including but not limited to activities permitted under programs of the Small Business Administration and other economic development programs of the Federal, state, or local governments; such activities to include buying and selling real property and developing and leasing such property, together with the creation of financial instruments and entities appropriate for such purposes;

"(7) In furtherance of these declared purposes, to carry out a contract or contracts, as amended from time to time, between the Corporation and the City; such services as therein specified, or to be specified, to include, by example and not by way of limitation, the coordination of public functions such as the preparation, adoption, and execution of Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones;

"(8) To coordinate activities of local, state, and Federal agencies as well as private for-profit and non-profit entities for the purpose of achieving the Corporation's objectives, and to receive and expend funds from any legal source for any legal purpose so long as consistent with its declared purposes;

"(9) To undertake activities within the City or outside the City when such activities are reasonably anticipated to have an impact on the City; which activities may include research, planning, and investigation, as well as developing and maintaining public and private sector contacts in furtherance of these corporate purposes; and

"(10) To do anything permitted by Section 2–103 of the Corporations and Associations Article of the Annotated Code of Maryland as amended from time to time, subject to any limitations imposed under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended from time to time...."

Amended Articles of Incorporation of the City of Baltimore Development Corporation, ART. FOURTH, October 4, 1991.

## B. "The Superblock."

In 1999, the Baltimore City Council enacted an amendment to the Urban Renewal Plan, City of Baltimore Ordinance 99–423, for the Westside section of Downtown Baltimore which was advertised as the largest Urban Renewal Plan since the Inner Harbor revitalization took place. Section 3 of that Ordinance states:

"That it is necessary to acquire, by purchase or by condemnation, for urban renewal purposes, the fee simple interest or any lesser interest in and to the following properties or portions thereof, together with all right, title, interest. . . ."

Section 4 of Ordinance 99–423 gives the BDC, "acting pursuant to its contract with the Mayor and City Council,"[7] certain responsibilities with respect to the Westside project. Sections 5 and 6 of Ordinance 99–423 contain additional responsibilities the BDC is required to fulfill, separate and apart from its contract with the City.[8]

---

7. It is not clear exactly what contract the BDC would be acting "pursuant to" as provided in Section 4 of Ordinance 99–423. The record contains two contracts. The first is dated September 1, 1965, and is between the Mayor and City Council of Baltimore, and one of the BDC's predecessor companies, Charles Center–Inner Harbor Management, Inc. The second contract is dated May 26, 2004, and is entitled "COMMUNITY DEVELOPMENT BLOCK GRANT–29 AGREEMENT BETWEEN THE CITY AND CITY OF BALTIMORE DEVELOPMENT CORPORATION."

8.

### ORDINANCE 99–423

"**SECTION 4. AND BE IT FURTHER ORDAINED;** That the Baltimore Development Corporation acting pursuant to its contract with the Mayor and City Council by and through the Department of Housing and Community Development, and working cooperatively with the Relocation staff of the Department of Housing and Community Development, commits to:
"(1) compiling and maintaining a comprehensive record of all existing business owners who express an interest in returning to the redeveloped areas. The record will include, but not be limited to, name, address, phone and fax numbers, type of business inter-

est, size (square footage) of business interest, desired cost range, etc.;

"(2) arranging and attending meetings between the developers and those interested businesses as soon as developers are selected by the City for one or more of the redeveloped areas; and

"(3) working with the interested businesses and the developers to propose, if financial necessity is indicated, financial assistance packages under existing programs including, but not limited to, City, State, and Federal below-market-rate loans and/or grants through Baltimore Development Corporation or other entities.

"**SECTION 5. AND BE IT FURTHER ORDAINED;** That the Baltimore Development Corporation (BDC), as described above in Section 5, commits to the following regarding the process to work with developers and interested groups/individuals to encourage the preservation/adaptive reuse of existing buildings:

"(1) In all BDC-issued Request for Proposals (RFPs) and in public advertisements that invite further developer responses to a BDC-received unsolicited proposal, BDC commits to include the following statement:

Developers are encouraged to submit proposals which include the preservation and rehabilitation, where feasible, of other structures within the area.

"(2) Following the receipt of responses to RFPs and of responses to advertisements regarding unsolicited proposals, BDC will require the respondents to present architectural designs and economic data with the objective of preserving/adaptively reusing as many existing buildings as is feasible (both from design and economic points of view) within the relevant areas.

"(3) The selected development team will be asked to study the design and economic implications of at least one alternative in which additional buildings may be preserved/adaptively reused. Representatives of all groups expressing an interest in this matter will be invited by BDC to participate in meetings with the selected development team. Such representatives will be asked by BDC to express their views verbally and in writing regarding the development team's proposal, and if they desire, to present design/economic alternatives for consideration by the development team and BDC. BDC will respond in writing within 21 calendar days of the submission to any such alternatives.

"**SECTION 6. AND BE IT FURTHER ORDAINED;** That within 90 calendar days of approval of this Ordinance, BDC, as described in Section 5, above, will draft proposed revisions to the responsibilities and composition of the Market Center Project Area Committee (PAC) (the composition will include, but not be limited to, members of the Market Center Merchants Association, the West Side Task Force, the Citizens Planning and Housing Association, the Commission for Historical and Architectural Preservation, the Governor's Task Force on African American Entrepreneurship in Baltimore City, the Maryland Historical Trust, Preservation Maryland, Baltimore Heritage, the Baltimore Chapter of the American Institute of Architects, and the Baltimore Architecture Foundation). The PAC will be staffed by BDC.

It is the matter referred to by the parties as the "Super-block" that brings this case before the Court. The Superblock is a part of the Westside project and its boundaries are, generally, the 100 block of Clay Street and the 200 block of West Lexington Street on the north; the 100 block of North Howard Street on the west; West Fayette Street on the south; and North Liberty Street on the east. Within this perimeter are more than 50 individual properties which comprise a total of 3.62 acres. Some of the properties to be condemned or purchased by the City, as part of the Super-block project, are owned by respondents.

On October 27, 2003, the BDC solicited requests for propos-als ("RFP's") to develop the Superblock. All of the respon-dents submitted development proposals to the BDC for the buildings they owned or occupied by February 27, 2004. On October 23, 2004, respondents submitted a written request to the BDC seeking, under Maryland's Public Information Act, access to minutes of meetings of the BDC's Board of Di-rectors, copies of the proposals submitted for the Superblock, and other information in the BDC's possession regarding the proposals. On November 9, 2004, the BDC's President denied the request, writing: "As a separate non-profit corporation, the City of Baltimore Development Corporation is not subject to the Maryland Public Information Act."

On November 16, 2004, all of the respondents, except Car-mel Realty, received a letter from the BDC stating that it would contact each of them to arrange a meeting within two weeks of the date of the letter to discuss each respondent's

---

"BDC will present a draft of the proposed responsibilities and composition of the PAC for written comments by all parties. Written responses are to be submitted to BDC within 30 calendar days of receipt of the draft. The final decision regarding the responsibilities and composition of the PAC is at the discretion of BDC, and BDC will make that decision within 30 calendar days after the receipt of the aforementioned comments date. One of the responsibilities of the PAC will be working together with BDC to develop a multi-year schedule of events to highlight the history of and to promote the area as a vital urban destination and a place for living, working, shopping, and entertainment."

proposal for the development of his or her property. Respondents were to "come prepared to discuss overall costs, financing sources and uses, owner's equity, anticipated public tax credit, subsidy, and grant or loan assistance...." The letter was signed by the BDC's Chief Operating Officer.

On November 18, 2004, respondents submitted a written request to the BDC for information regarding the BDC's Board of Directors' scheduled meetings so that respondents could attend. The record does not contain a response by the BDC to this request. On that same day, the BDC's Board of Directors met and voted unanimously to recommend to the Mayor one entity as the "key developer" for the Superblock. Two other developers were selected to revitalize areas within the Superblock, but Carmel Realty was the only respondent to be selected as a developer.

On November 29, 2004, respondents filed a two count Complaint alleging that the BDC, as the "economic development arm" of Baltimore City, is subject to the provisions of the Open Meetings Act and that, as the City's instrumentality, the BDC is subject to the provisions of Maryland's Public Information Act. On March 14, 2005, the Circuit Court heard arguments on the parties' cross-motions for summary judgment. On June 8, 2005, the Circuit Court issued an Order with a Memorandum Opinion granting petitioner's motion and denying respondent's motion. Respondents appealed to the Court of Special Appeals.

On January 24, 2006, in an unreported opinion, the Court of Special Appeals reversed the judgment of the trial court and found that Maryland's Open Meetings and Public Information Acts applied to the BDC. For the reasons stated below, we affirm the judgment of the Court of Special Appeals.

## II. Standard of Review

An appellate court reviews a trial court's grant of summary judgment *de novo*. *Mayor and City Council of Baltimore v. Whalen*, 395 Md. 154, 161, 909 A.2d 683 (2006); *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385

Md. 99, 106, 867 A.2d 1026, 1030 (2005). Prior to making a determination as to whether the trial court was correct as a matter of law, the appellate court must make an initial determination as to whether there is a genuine dispute of material fact. *Whalen,* 395 Md. at 161, 909 A.2d at 688; *Jurgensen v. New Phoenix Atlantic Condominium Council of Unit Owners,* 380 Md. 106, 114, 843 A.2d 865, 869 (2004). Factual disputes and reasonable inferences drawn from the facts of the case must be resolved in favor of the non-moving party. *Whalen,* 395 Md. at 161, 909 A.2d at 688; *Jurgensen,* 380 Md. at 114, 843 A.2d at 869. Only when there is an absence of a genuine dispute of material fact, will an appellate court make a determination as to whether the trial court was correct as a matter of law. *Whalen,* 395 Md. at 161–62, 909 A.2d at 688; *Rockwood,* 385 Md. at 106, 867 A.2d at 1030.

The parties do not dispute any material facts for the purposes of determining whether the BDC is a public body under the Open Meetings Act or whether it is an instrumentality of Baltimore City under Maryland's Public Information Act. Therefore, our sole task is to make a determination as to whether the Circuit Court for Baltimore City was correct as a matter of law when it held that the Open Meetings Act and Maryland's Public Information Act do not apply to the BDC.

## III. Discussion

Eminent domain is the " 'inherent power of a governmental entity to take privately owned property ... and convert it to public use....' " *J.L. Matthews, Inc. v. Maryland–National Capital Park and Planning Commission,* 368 Md. 71, 87, 792 A.2d 288, 297 (2002) (quoting *Black's Law Dictionary* 541 (7th ed.1999)). It is a "basic principle of constitutional law that the power of eminent domain *adheres to sovereignty* and requires no constitutional authority for its existence." *Lore v. Board of Public Works of State of Maryland,* 277 Md. 356, 358, 354 A.2d 812, 814 (1976) (emphasis added). The "mode and manner of the exercise of the power of eminent domain, however, is exclusively vested in the judgment and discretion of the Legislature, and is not without

its limitations." *Matthews,* 368 Md. at 87, 792 A.2d at 297 (citations omitted) (quotations omitted). The Fifth[9] and Fourteenth[10] Amendments to the United States Constitution, together with Article III, § 40 of the Maryland Constitution[11] limit the Legislature's power of eminent domain "by requiring that the taking of private property by governmental entities 'be for public use and that just compensation be paid.'" *Matthews,* 368 Md. at 87, 792 A.2d at 297 (quoting *Utilities, Inc. Of Md. v. Wash. Suburban Sanitary Comm'n,* 362 Md. 37, 45–46, 763 A.2d 129, 133 (2000)).

The recent Supreme Court decision *Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), has sparked national, state, and local public debate over the eminent domain process. Writing for the dissent in *Kelo,* Justice O'Connor explained that Court's historical interpretation of the limitations the Fifth Amendment places on the exercise of eminent domain:

> "[W]e have read the Fifth Amendment's language to impose two distinct conditions on the exercise of eminent domain: the taking must be for a 'public use' and 'just compensation' must be paid to the owner.
>
> "These two limitations serve to protect 'the security of Property,' which Alexander Hamilton described to the Philadelphia Convention as one of the 'great obj[ects] of Gov[ernment].' Together they ensure stable property ownership by providing safeguards against excessive, unpredictable, or unfair use of the government's eminent domain

---

**9.** The Fifth Amendment guarantees that no person will be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

**10.** The Fourteenth Amendment does not permit a state to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1.

**11.** Subject to certain exceptions, § 40 does not permit the General Assembly to "enact a Law authorizing private property to be taken for public use without just compensation...." Md. Const. art. III, § 40.

power-particularly against those owners who, for whatever reasons, may be unable to protect themselves in the political process against the majority's will.

"While the Takings Clause presupposes that government can take private property without the owner's consent, the just compensation requirement spreads the cost of condemnations and thus prevents the public from loading upon one individual more than his just share of the burdens of government. The public use requirement, in turn, imposes a more basic limitation, circumscribing the very scope of the eminent domain power: Government may compel an individual to forfeit her property for the *public's* use, but not for the benefit of another private person. This requirement promotes fairness as well as security.[12]

"Where is the line between 'public' and 'private' property use? We give considerable deference to legislatures' determinations about what governmental activities will advantage the public. But were the political branches the sole arbiters of the public-private distinction, the Public Use Clause would amount to little more than hortatory fluff. An external, judicial check on how the public use requirement is interpreted, however limited, is necessary if this constraint on government power is to retain any meaning."

*Kelo*, 545 U.S. at 496–97, 125 S.Ct. at 2672–73 (O'Connor, J. dissenting) (citations omitted) (quotations omitted). It is clear in the present case that the BDC functions as part of the exercise of the City's powers of eminent domain.[13] The BDC by itself has no such power.

---

**12.** Justice Thomas, also dissenting in *Kelo,* added:

"Long ago, William Blackstone wrote that 'the law of the land ... postpone[s] even public necessity to the sacred and inviolable rights of private property.' The Framers embodied that principle in the Constitution, allowing the government to take property not for 'public necessity,' but instead for 'public use.' "

*Kelo,* 545 U.S. at 505, 125 S.Ct. at 2677 (Thomas, J. dissenting).

**13.** The BDC, among other indicia of the exercise of part of the City's powers, is charged by the ordinance, the contracts with the City, and by its Charter to coordinate public functions such as the preparation and

We are mindful that the issues discussed by Justice O'Conner above appear to be at the very root of most urban renewal disputes, but they are not presently before us and we leave them for another day. We only note that when one is forced to convey his or her property to a public entity it is in contravention, albeit alleviated by compensation and thus permitted, of a constitutional right and, seemingly, such proceedings should be even more open to public scrutiny especially when the property might ultimately be conveyed to other private parties.

## A. Statutory Interpretation.

 In *Chow v. State*, the Court recited the principles of statutory interpretation which we have so often stated:

" 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.

" 'In construing the plain language, [a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application. Statutory text should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

---

adoption of urban renewal plans, and is thus a part of the apparatus used by the City in the exercise of its urban renewal powers. The primary source of Baltimore's Mayor's and City Council's power of eminent domain and condemnation is found in Article XI–B, and Article XI–C of the Maryland Constitution. The BDC's involvement in the process is through, and only through, the City. The power of eminent domain *adheres* to the City's *sovereignty* generally, and by reason of the constitutional provisions. BDC has no independent source of power in the urban renewal process.

" 'If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for the Legislature is presumed to have meant what it said and said what it meant.' "

*Chow*, 393 Md. 431, 443–44, 903 A.2d 388, 395 (2006) (quoting *Kushell v. Dept. of Natural Resources*, 385 Md. 563, 576–77, 870 A.2d 186, 193–94 (2005)) (citations omitted) (quotations omitted). The *Chow* Court continued:

" 'In some cases, the statutory text reveals ambiguity, and then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal. However, before judges may look to other sources for interpretation, first there must exist an ambiguity within the statute, i.e., two or more reasonable alternative interpretations of the statute. Where the statutory language is free from such ambiguity, courts will neither look beyond the words of the statute itself to determine legislative intent nor add to or delete words from the statute. Only when faced with ambiguity will courts consider both the literal or usual meaning of the words as well as their meaning in light of the objectives and purposes of the enactment. As our predecessors noted, "We cannot assume authority to read into the Act what the Legislature apparently deliberately left out. Judicial construction should only be resorted to when an ambiguity exists." Therefore, the strongly preferred norm of statutory interpretation is to effectuate the plain language of the statutory text.' "

393 Md. at 444, 903 A.2d at 395 (quoting *Price v. State*, 378 Md. 378, 387–88, 835 A.2d 1221, 1226 (2003) (citations omitted)). We will apply these principles to the Open Meetings Act and to Maryland's Public Information Act in turn.

### B. Open Meetings Act.

The openness of government was an issue of great import to at least one of this Country's founding fathers. John Adams, when distinguishing between the manner in which the public business of his ancestors was carried out and his hopes for the future of America, wrote that:

> "Liberty cannot be preserved without a general knowledge among the people, who have a right . . . and a desire to know; but besides this, they have a right, an independent right, an indisputable, unalienable, indefeasible, divine right to that most dreaded and envied kind of knowledge, I mean of the characters and conduct of their rulers." [14]

Maryland's first comprehensive legislation regarding open meetings came into being over 200 years later when, in 1977, the General Assembly enacted sections 7 through 15 of Article 76A of the Maryland Code. *Community and Labor United For Baltimore Charter Committee (C.L.U.B.) v. Baltimore City Board of Elections,* 377 Md. 183, 193, 832 A.2d 804, 809 (2003) (*citing Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 137–138, 699 A.2d 434, 440 (1997)). "[T]he heart of the Act [15] is found in the public policy declarations of § 7, *i.e.,* that 'public business be performed in an open and public manner and that the citizens be advised of and aware of . . . the *deliberations and decisions* that go into the making of public policy.' " *New Carrollton v. Rogers,* 287 Md. 56, 71–72, 410 A.2d 1070, 1078 (1980) (emphasis added). Then–Chief Judge Murphy, writing for the Court in *New Carrollton,* eloquently explained the policy behind the Open Meetings Act:

---

**14.** *A Dissertation on Canon and Feudal Law,* John Adams (1765).

**15.** At the time Maryland Code (1957, 1975 Repl.Vol., 1979 Cum. Supp.), Art. 76A, §§ 7–15, what is now the Open Meetings Act, was commonly referred to as the Sunshine Law and Chief Judge Murphy referred to it as the "Act" in *New Carrollton v. Rogers,* 287 Md. 56, 58, 410 A.2d 1070, 1071 (1980). There is no substantial difference between the portions of the Act addressed in *New Carrollton* and those found in the current version of the Open Meetings Act.

"While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that *the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well to all deliberations which precede the actual legislative act or decision.* ... It is, therefore, *the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business.* In this regard, the Supreme Court of Florida, in *Town of Palm Beach v. Gradison,* 296 So.2d 473 (Fla.1974), construing that state's open meeting law, observed:

> 'One purpose of the government in the sunshine law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. *That statute should be construed so as to frustrate all evasive devices.* This can be accomplished only by embracing the collective inquiry and discussion stages with the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates *to any matter on which foreseeable action will be taken.*' 296 So.2d at 477." (Emphasis added.)

*New Carrollton,* 287 Md. at 72–73, 410 A.2d at 1078–79 (citations omitted). Judge Eldridge, more recently for this Court, stated: "The clear policy of the Open Meetings Act is to allow the general public to view the *entire* deliberative process." *C.L.U.B.,* 377 Md. at 194, 832 A.2d at 810 (emphasis added). Article 76A was recodified as §§ 10–501–10–512 of the Open Meetings Act by Chapter 284 of the Acts of 1984 without any substantial changes. Therefore, the fundamental

policy of the Open Meetings Act is the same today as it was in 1977, that: "it is *essential to the maintenance of a democratic society* that ... public business be performed in an open and public manner; and citizens be allowed to observe ... the *deliberations and decisions* that the making of public policy involves." § 10–501(a)(1)(ii) (emphasis added).

We continue with the plain language of the relevant portions of the Open Meetings Act:

"(h) *Public body.*—(1) 'Public body' means an entity that:

(i) consists of at least 2 individuals; and

(ii) is created by:

1. the Maryland Constitution;

2. a State statute;

3. a county charter;

4. an ordinance;

5. a rule, resolution, or bylaw;

6. an executive order of the Governor; or

7. an executive order of the chief executive authority of a political subdivision of the State.

(2) 'Public body' includes:

(i) any multimember board, commission, or committee appointed by the Governor or the chief executive authority of a political subdivision of the State, or appointed by an official who is subject to the policy direction of the Governor or chief executive authority of the political subdivision, if the entity includes in its membership at least 2 individuals not employed by the State or the political subdivision; ..."

§ 10–502(h).

 Petitioner argues that it is not a public body within the meaning of the Open Meetings Act because it is not an entity created by one of the provisions of § 10–502(h)(1). It urges us to read § 10–502(h)(2) as being merely illustrative of § 10–502(h)(1) because the word "means" is used in (h)(1) and the word "includes" is used in (h)(2). Petitioner argues that the Legislature uses "means" to define and "includes" to

illustrate or give examples only of what it has already defined in § 10–502(h)(1). The BDC incongruously relies on Maryland Code (1957, 2005 Repl.Vol.), Article 1, § 30, for support: "The words 'includes' or 'including' mean, unless the context requires otherwise, includes or including by way of illustration *and not by way of limitation.*" (Emphasis added). Petitioner also cites to *Hackley v. State,* in which we quoted from the Maryland Style Manual for Statutory Law, Department of Legislative Services (Jan.1998) at 27: "[L]egislative drafters [are] to '[u]se "means" if the definition is intended to be exhaustive' . . . and to '[u]se "includes" if the definition is intended to be partial or illustrative'. . . ." *Hackley,* 389 Md. 387, 393, 885 A.2d 816, 820 (2005). In short, petitioner argues that § 10–502(h)(1) lists exclusively the threshold indicia of a public body for the purposes of the Open Meetings Act and § 10–502(h)(2) only illustrates or gives examples of those types of public bodies specified in § 10–502(h)(1). We disagree; rather, the two sections address alternative approaches. Section 10–502(h)(2) introduces a new concept and is not a subsidiary section to § 10–502(h)(1) because it introduces a different set of public bodies other than those described in § 10–502(h)(1).

Respondent's position is consistent with our view. Initially, respondent asserts that the BDC is subject to § 10–502(h)(1) because it originally had three "high City officials" on its governing body and because the BDC's website stated it was "chartered" by the City. Respondent also argues, persuasively, that when § 10–502(h)(1) and (2) are read together in context, the word "includes" is not used to limit § 10–502(h)(1) because § 10–502(h)(2) introduces a different manner in which qualifying public bodies may be created that is separate and distinct from § 10–502(h)(1). Thus, respondent asserts, the context of the word "includes" prevents it from being read only as illustrative of and limited to the provisions of § 10–502(h)(1). We agree. Had it been a subsidiary clause of § 10–502(h)(1) it would have been made subject to the prior section and normally would have been designated " § 10–502(h)(1) . . . *(iii).*"

For an entity to meet the definition of a public body, § 10–502(h)(1)(i) requires that it consist of at least two individuals. Section 10–502(h)(1)(ii)(1–7) imposes the additional requirement that the entity be created by Maryland's Constitution; a State statute; a county charter; an ordinance; a rule, resolution, or bylaw; an executive order of the Governor; or an executive order of the chief executive authority of a political subdivision of the State. Thus, § 10–502(h)(1)(i) and (ii) make the Open Meetings Act applicable to entities consisting of at least two individuals that are created by some form of constitutional act, legislative act, or executive order. The BDC's Board of Directors consists of more than two individuals, as required by § 10–502(h)(1)(i), but there is nothing in the record to show that the BDC was created by any of the specific acts or orders found in § 10–502(h)(1)(ii) (1–7). Therefore, in the absence of support in the record, the BDC cannot be placed within the class of entities that are "public bodies" solely under the provisions of § 10–502(h)(1)(i) and (ii).

Section 10–502(h)(2)(i) additionally states, however, that a:

"(2) 'Public Body' includes:

(i) *any multimember board,* commission, or committee *appointed by* the Governor or *the chief executive authority of a political subdivision of the State,* or appointed by an official who is subject to the policy direction of the Governor or chief executive authority of the political subdivision, *if the entity includes in its membership at least 2 individuals not employed by the* State or the *political subdivision; . . ."* (Emphasis added.)

Section 10–502(h)(2)(i), as it pertains to the case at bar, makes multimember boards appointed by the chief executive authority of a political subdivision, which consist of at least two individuals not employed by the particular subdivision, subject to the Open Meetings Act. Thus, § 10–502(h)(2)(i) introduces a separate and distinct definition from the definition contained in § 10–502(h)(1) and the context requires that the word "includes" not be read as illustrative, *by way of limitation,* of

the § 10–502(h)(1) methods by which a public body subject to the act is defined. Were we to find otherwise, we would be reading § 10–502(h)(2)(i) and the distinct meaning it introduces, as superfluous or nugatory and we would not be harmonizing provisions dealing with the same subject so that each may be given effect. Such a reading would be inconsistent with the principles of statutory interpretation. Moreover, the parties do not dispute that the BDC's bylaws require it to be a multimember board, that its Board of Directors currently consists of at least two individuals not employed by Baltimore City,[16] and that the Board is nominated or appointed by the Mayor of Baltimore City.[17]

---

**16.** We do not mean to imply that if the members of the BDC's Board were all Baltimore City employees, that it would be exempt from the definition of "public body."

**17.** On November 4, 1997, the BDC's bylaws were amended so as to alter the number of directors and the appointing authority of the directors. The relevant portion of the amended bylaws is as follows:

"SECTION 1. *Number and Term of Office: Qualifications of Members*. The Corporation shall have not less than seven (7), nor more than fifteen (15) directors, which number may be set from time-to-time by resolution of the Board of Directors. The directors shall be elected by the Members as provided by law and in these By–Laws. Each director shall serve until his or her successor shall be duly elected and shall qualify.

"*The members of the Board of Directors shall include the Commissioner of the Department of the City and the Director of Finance of the City and those other persons who shall be so nominated by the Mayor of the City of Baltimore* and elected by the Members of the Corporation. In the event that either of the above offices shall not exist, the Members of the Corporation, by amendment of these By–Laws pursuant to Article IV, shall designate a different office or may designate other qualifications.

"The directors shall serve for a term of four (4) years. Directors may serve successive terms. *In the case of any vacancy in the Board of Directors through death, resignation, disqualification, **removal** (by the Board of Directors or **by the Mayor**), expiration of term, a vacancy in one of the offices specified above in this Section 1, or other cause, the person with the power to nominate such director shall appoint a successor to hold office for the unexpired portion of the term of the director whose place shall be vacant, and until the nomination and election of his or her successor.*

"The *Chairman of the Board of Directors shall be a member of the Board so nominated by the Mayor of the City of Baltimore* and so elected by the Board of Directors." (Emphasis added).

The City of Baltimore Development Corporation's Amended Articles of Incorporation provide:

"(1) The affairs of the Corporation shall be managed under the direction of a Board of Directors which shall exercise all corporate powers except as conferred on or reserved to the Members of the Corporation by law or the By–Laws of the Corporation.

"(2) The Board of Directors shall consist of such numbers of persons as may be provided from time to time by the By–Laws, but not less than four (4) persons. The members of the Board of Directors shall serve for such terms and shall have such qualifications as may be set forth in the By–Laws of the Corporation."

ART. SIXTH, October 4, 1991. Section (1) gives the Board of Directors power over the activities of the Corporation. Section (2) provides that, in accordance with the corporation's bylaws, the Board of Directors will consist of a certain number of people who have certain qualifications. The bylaws, as amended on November 4, 1997,[18] give the Mayor power of appointment or nomination to the Board, the power of removal over members of the Board, and the power to appoint directors to fill vacancies for the remainder of terms of vacating directors. The Mayor, to a large extent, can control the Board of Directors and the Board controls the BDC. Thus, through the nomination, removal, and appointment process, the Mayor controls the City of Baltimore Development Corporation and it is, in essence, a public body under the plain language of § 10–502(h)(2) and must comply prospectively with the provisions of the Open Meetings Act.[19]

---

18. *See* Footnote 17, *supra.*

19. Petitioner argues that because the members must approve any individual nominated or appointed by the Mayor, it is the members and not the Mayor who control the BDC's Board of Directors. We find this argument to be without merit given the existing process. Only an individual nominated or appointed by the Mayor will ever be put in front of the members for their approval. The Mayor's power of appointment or nomination combined with his power of removal allows him to exert a substantial amount of control over the Board. Thus, it is

Although there is no ambiguity in the term "includes" as it is used in § 10–502(h)(2) and no interpretation is required, petitioner argues, in the alternative, that the legislative history of § 10–502(h)(2) demonstrates that the General Assembly never intended to apply the Open Meetings Act to entities like the BDC. Petitioner bases its argument on an Attorney General's letter discussing the interpretation of "includes" (in the context of a failed amendment to the Open Meetings Act), two failed bills which would have expanded the definition of public body to expressly reach private corporations, and one failed bill which would have expanded the definition for the sole purpose of reaching the BDC.

We note at the outset, that Attorney General opinions are entitled to consideration, but that they are not binding on this Court. *Dodds v. Shamer*, 339 Md. 540, 556, 663 A.2d 1318, 1326 (1995). The proposed language of the suggested amendment to § 10–502(h)(2) that the Attorney General was asked to interpret for the purposes of the advisory letter was: " 'PUBLIC BODY' INCLUDES THE MULTIMEMBER GOVERNING BODY OF ANY CORPORATION DIRECTLY SUPPORTED ENTIRELY BY PUBLIC FUNDS." [20] (quotations omitted). That language, however, was not included in the amendment. The language that was actually enacted read:

> *"ANY MULTIMEMBER BOARD, COMMISSION, OR COMMITTEE APPOINTED BY THE GOVERNOR OR THE CHIEF EXECUTIVE AUTHORITY OF A POLITICAL SUBDIVISION OF THE STATE, IF THE ENTITY INCLUDES IN ITS MEMBERSHIP AT LEAST 2 INDI-*

---

the Mayor who substantially controls the individuals on the Board and not the members.

[20]. The Attorney General letter, dated April 2, 1991, was in response to a request made by then-Delegate Elijah Cummings regarding the proposed language of Senate Bill 170 and whether the proposed language would affect a non-profit entity that operated group homes for the mentally challenged.

*VIDUALS NOT EMPLOYED BY THE STATE OR A
POLITICAL SUBDIVISION OF THE STATE. . . ."*

Chapter 655 of the Acts of 1991. The letter from the Attorney
General is not relevant to the case at bar because the version
of the bill that the Attorney General was asked to interpret
was apparently rejected by the General Assembly when it
enacted an entirely different version of the bill that included
the language we here interpret.[21]

Petitioner then argues that three proposed amendments to
the definition of "public body" that were rejected by the
General Assembly are evidence that it never intended § 10–
502(h)(2) to apply to the BDC. The first two proposed bills
were essentially the same. In 1998, Senate Bill 340 proposed
an amendment to § 10–502(h)(2) that would make corporations
whose bylaws required at least half of the governing body to
be composed of public officers or public employees or the
appointees of public officers or public employees subject to the
Open Meetings Act. Senate Bill 608, introduced in 2000, would
have only made corporations whose bylaws required the Board
of Directors to be composed of at least half public appointees
subject to the Open Meetings Act. Also in 2000, Senate Bill
241 attempted to amend § 10–502(h)(2) to specifically include
the BDC.[22]

---

**21.** The General Assembly made the following amendment to § 10–
502(h)(2)(i) in 2004:

> "any multimember board, commission, or committee appointed by
> the Governor or the chief executive authority of a political subdivi-
> sion of the State, OR APPOINTED BY AN OFFICIAL WHO IS
> SUBJECT TO THE POLICY DIRECTION OF THE GOVERNOR OR
> CHIEF EXECUTIVE AUTHORITY OF THE POLITICAL SUBDIVI-
> SION, if the entity includes in its membership at least 2 individuals
> not employed by the State or [a] THE political subdivision [of the
> State]; . . ."

Chapter 440 of the Acts of 2004. The added language (in all capital
letters) and the deleted language (in brackets) does not substantially
change the language of the statute for the purposes of petitioner's
argument regarding the Attorney General's letter.

**22.** Senate Bill 241 also attempted to amend § 10–611(g)(1) of Mary-
land's Public Information Act to specifically include the BDC.

When addressing this precise issue with respect to Failed Senate Bill 340, the Court of Special Appeals said: "Although it may be appropriate and useful to review a failed legislative effort in determining legislative intent, whether as part of the original legislative effort or subsequent amendments, legislative rejection is not an infallible indicator of legislative intent." *Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md.App. 125, 154, 724 A.2d 717, 731 (1999). *See also, State v. Bell*, 351 Md. 709, 721, 720 A.2d 311, 318 (1998). We have pointed out that this is because the General Assembly may well have concluded that the rejected amendment "warrant[ed] further investigation" before acting on it, *Automobile Trade Ass'n v. Ins. Comm'nr*, 292 Md. 15, 24, 437 A.2d 199, 203 (1981), or decided not to enact the amendment for a myriad of other reasons. It may have felt that the entity was already covered by the Open Meetings Act and that a statute expressly so providing was superfluous. Thus, "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent," *id.* at 24, 437 A.2d at 203, and we are not persuaded that the failure of the General Assembly to enact the above mentioned Bills is demonstrative of their intent that the BDC not be subject to the Open Meetings Act.

In summary, the Legislature, as a matter of public policy, has determined that it is essential to the maintenance of a democratic society that, subject to certain well defined exceptions, the deliberations of a public body be open to the public which it serves. An entity that possesses as many public traits as does the BDC is a public body for the purposes of the Open Meetings Act. The table below represents a survey of the provisions of the Corporate Charter, the BDC contracts with the City, and the governing ordinance and is a powerful visual aid demonstrating the extent to which the BDC has been able to cloak the business of the Citizens of the City of Baltimore behind the veil of a supposedly private corporation.

| Purely Public Function | Public and Private Function | Purely Private Function |
|---|---|---|
| Develop and implement long-range development strategies *for the City.* | Coordinate development efforts between the public and private sector and *expedite the review of public approvals and other government services in the City.* | |
| Undertake any appropriate activity to achieve the continued strong business climate, urban renewal, and development *throughout the City.* | Provide in the furtherance of these declared purposes, financing, financial assistance, and financial advice, including but not limited to activities permitted under programs of the Small Business Administration and other economic development programs of the Federal, state, *or local governments.* | |
| Implement, oversee, and encourage public and private development and rehabilitation projects that *will increase the City's tax base.* | Encourage cultural, entertainment, recreational, historic, and educational facilities that *will further the promotion of the benefits of living or visiting the City; to bring new spending power to the City's economy.* | |
| Enhance and improve the physical and cultural environment *of the City* through the creation of *public* open space, and *improved transportation systems.* | Enhance and improve the image of the City as a place to live, work, and visit; and to encourage new residential initiatives in the City. | |
| Improve the economic health *of the City* through attraction of new businesses, retention of existing businesses, and the stimulation and encouragement of growth and expansion of commercial office uses, manufacturing, warehousing, distribution, research, and development. | Coordinate activities of local, state, and Federal agencies as well as private for-profit and non-profit entities for the purpose of achieving the Corporation's objectives, and to receive and expend funds from any legal source or legal purpose so long as consistent with its declared purposes. | |
| In furtherance of these declared purposes, to carry out a contract or contracts, between the Corporation and the City; such services as therein specified, to include, *the coordination of public functions such as preparation, adoption, and execution of Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones.* | Undertake activities within the City or outside the City *when such activities are reasonably anticipated to have an impact on the City;* which activities may include research, planning, and investigation. | |
| *The Mayor of Baltimore has the power to appoint or nominate the BDC's Board of Directors, including the Chairman of the Board.* | Increase minority business enterprise and women's business enterprise participation in business and development activity. | |

| | |
|---|---|
| *The Mayor of Baltimore has powers in respect to removing* the BDC's Board of Directors, including the Chairman of the Board. | |
| If BDC ceases to exist, pursuant to contract with the City, tangible property purchased with funds attached to that contract *revert to the City.* | |
| *Over 80% of the BDC's budget is provided by the City of Baltimore.* | The remaining percentage of the BDC's funding comes from public and private sources other than the City. |

The left-hand column indicates the most direct qualities which make the BDC a public body under the Open Meetings Act. The middle column indicates activities with both a public and a private connotation. As far as we have discerned, from the record before us, there are no purely private functions of the BDC for the purposes of the Open Meetings Act. As such, it is consistent with the intent of the Open Meetings Act that the deliberative process of the BDC, to include all deliberations preceding the final decisions made by the Mayor or the City Council, must be open to the public to the same extent as would any proceeding of the Mayor or City Council of Baltimore City. This is because every step of the process comprises the consideration or transaction of public business. Thus, consistent with the precedent established by the Court in the opinion written by then-Chief Judge Murphy in *New Carrollton, supra,* we have construed the statute so as to frustrate all evasive devices relating to any public matter upon which foreseeable public action will be taken.

### C. Maryland's Public Information Act.

 Section 10–611(g)(1)(i) of Maryland's Public Information Act ("MPIA") states:

"'Public record' means the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; ..."

Maryland Code (1984, 2004 Repl.Vol.), § 10–611 of the State Government Article.

Petitioner argues that it is not a statutorily created entity and, therefore, the MPIA does not apply to it. Respondent argues that the law only requires that the BDC be an "instrumentality" of Baltimore City for the MPIA to apply. Thus, the dispositive issue is whether the BDC is an "instrumentality" of Baltimore City. We hold that the BDC is an instrumentality of the City.[23]

Such a holding is consistent with the stated purpose of the Maryland Public Information Act:

"(a) *General rights of information.* All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

(b) *General construction.* To carry out the right set forth in subsection (a) of this section, unless unwarranted invasion of the privacy of a person in interest would result, this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests inspection."

§ 10–612. Moreover, holding that the BDC is an instrumentality of the City is consistent with our interpretation of the General Assembly's intent when it enacted the MPIA: "[I]t is well established that ' "the provisions of the [MPIA] reflect the legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government." ' " *Caffrey v. Department of Liquor Control for Montgomery County,* 370 Md. 272, 305, 805 A.2d 268 (2002) (quoting *Kirwan v. The Diamondback,* 352 Md. 74, 81, 721 A.2d 196, 199 (1998) (holding that parking violations issued to the head coach and members of the basketball team at the University of Maryland were subject to

---

**23.** As we have indicated, we are unaware of any purely private function of the BDC relevant to whether it is subject to the MPIA.

the MPIA)); *accord Fioretti v. Md. State Bd. of Dental Exam'rs,* 351 Md. 66, 73, 716 A.2d 258, 262 (1998) (State Board of Dental Examiners failed to carry its burden that its records fell within the MPIA's exception for law enforcement reports compiled for investigatory purposes); *A.S. Abell Pub.Co. v. Mezzanote,* 297 Md. 26, 32, 464 A.2d 1068, 1071 (1983) (statutorily created Maryland Insurance Guaranty Trust was an instrumentality of the State and therefore, subject to the MPIA). On several occasions, this Court has " 'explained that the provisions of the statute" must be liberally construed ... in order to effectuate the [MPIA's] broad remedial purpose." ' " *Caffrey,* 370 Md. at 306, 805 A.2d at 288 (quoting *Kirwan,* 352 Md. at 81, 721 A.2d at 199). Therefore, finding that the MPIA is applicable to the BDC is consistent with the stated purpose and the intent of the statute; the public should have broad access to information concerning the operation of governmental instrumentalities especially when the instrumentality's operations may involve charting the course and laying the foundation leading to the involuntary, albeit legal, taking of constitutionally protected private property even for compensation.

■■■ The ordinary and popular meaning of the plain language of the statute does not require that an entity be established by a statute for it to be subject to the provisions of the MPIA. The statute only requires that the entity be a "unit or instrumentality" of the City for its provisions to apply.[24] Instrumentality is defined as "the quality or state of being instrumental" and instrumental is defined as "serving as a means, agent, or tool." *Merriam Webster's Collegiate Dictionary* 607 (10th ed.1998). Instrumentality is also defined as: "1. A thing used to achieve an end or purpose. 2. A means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Black's Law Dictionary* 814 (8th ed.2004). As the table above indicates,

---

**24.** The parties focus their arguments on whether the BDC is an "instrumentality" of the City and do not substantially address whether it is a "unit" of the City. Thus, we will only address whether the BDC is an instrumentality of the City.

the BDC was formed to plan and implement long range development strategies throughout the City of Baltimore in behalf of the City of Baltimore; to implement, oversee, and encourage development that will increase the City's tax base; to provide jobs in the City; to enhance and improve the physical and cultural environment of the City; to improve the economic health of the City; and to be responsible for Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones on behalf of the City. The BDC was clearly established, and is maintained, as an agent or tool of Baltimore City in order to accomplish the City's ends or purposes. Thus, the plain language of the statute, in its ordinary and popular meaning, makes the BDC, in essence, an instrumentality of the City and, therefore, the MPIA is applicable to the BDC.

Petitioner argues, in the alternative, that if we find ambiguity in § 10–611(g)(1)(i), that *Moberly v. Herboldsheimer*, 276 Md. 211, 345 A.2d 855 (1975) and *Mezzanote*, 297 Md. 26, 464 A.2d 1068, require us to find that the determining factor in whether the BDC is subject to the MPIA is whether it was created by law. Although we perceive no ambiguity in § 10–611(g)(1)(i), we will address these arguments.

Petitioner misconstrues the holdings of *Moberly* and *Mezzanote*. There is no one factor we looked to in either of those cases to determine whether an entity is an instrumentality of the state. Instead, we examined all aspects of the relationship between the entity and the state or political subdivision. In *Moberly*, the Court was asked to determine whether a statutorily established corporation, known as the Board of Governors of the Memorial Hospital of Cumberland, was subject to the provisions of the MPIA. The *Moberly* Court found that a statutorily established corporation was subject to the MPIA based on all aspects of the interrelationship between it and the City of Cumberland. 276 Md. at 225, 345 A.2d at 862–63. In *Mezzanote*, the Court was asked to determine whether the statutorily created Maryland Insurance Guaranty ("MIGA") was an instrumentality of the state for the purposes of the MPIA. The *Mezzanote* Court concluded that MIGA was sub-

ject to the provisions of MPIA only after: "[E]xamining all aspects of the interrelationship between the State and MIGA, including the degree of control exercised by the State over MIGA's operation...." 297 Md. at 39, 464 A.2d at 1074. Thus, the fact that the Memorial Hospital of Cumberland and MIGA were created by statute was *one factor, but not the only factor* in assessing the degree of control exercised by the State or political subdivision over that entity.

With respect to the BDC, the following aspects of its relationship with the City make it an instrumentality of the City: The BDC's Board of Directors, to include the Chairman of the Board, are nominated or appointed by the Mayor of Baltimore; he has the power to remove members of the Board before their four year terms are up; the Mayor also has the power to fill vacancies; the City's Commissioner of the Department of Housing and Community Development and the City's Director of Finance are permanent members of the Board; the BDC receives a substantial portion of its budget from the City; [25] the BDC has a tax exempt status under the Internal Revenue Code; pursuant to the City's contract with the BDC, if it should cease to exist, the City would control the disposition of the BDC's assets; BDC is also authorized to prepare and adopt Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones which are traditionally governmental functions.[26] We

---

**25.** There is some evidence in the record that the BDC receives as much as 87% of its budget from the City. In any event, City of Baltimore Ordinance 04-724, "[f]or the purpose of providing the appropriations estimated to be needed by each agency of the City of Baltimore for operating programs and capital projects during the fiscal 2005 year," budgeted 7.75 million dollars to the BDC for the West Side Initiative alone and 11.15 million dollars to the BDC for other initiatives, programs, repairs, development and financing.

**26.** This list is not, nor is it intended to be, exhaustive of all the aspects of the BDC's relationship with Baltimore City that make it an instrumentality of the City for the purposes of Maryland's Public Information Act. We do not intend to imply that the factors listed above are exhaustive with respect to any future determination made regarding whether an entity is an instrumentality of the state or a political subdivision. The emphasis should be placed on the overall relationship

also note that the City Solicitor represented the BDC in this matter.[27] Thus, even though the BDC was not created by a legislative act, the factors listed above demonstrate that the BDC is subject to substantial control by the City because of how closely the two are intertwined. Therefore, even if the statute is ambiguous, which it is not, and the test applied in *Moberly* and *Mezzanote* was controlling—even under that test—the BDC is, in essence, an instrumentality of the City.

## IV. Conclusion

We hold that the trial court erred as a matter of law and that the City of Baltimore Development Corporation is, in essence, a public body for the purposes of the Open Meetings Act and that it is also an instrumentality of the City of Baltimore for the purposes of Maryland's Public Information Act.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS FOR THE CIRCUIT COURT TO RENDER JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

---

between the entity and the State government or political subdivision always remembering that the Legislature intended this statute to have a broad reach.

**27.** Article VII, § 24(a) of the Charter of Baltimore City provides:

"The City Solicitor shall be the legal adviser and representative of the City and its several departments, officers, commissions, boards and authorities, and shall have general supervision and direction of the legal business of the City...."

The City Solicitor, at oral argument and in response to this Court's query regarding his representation of the BDC in this matter, stated that it is not unusual for the City Solicitor to represent entities that are not part of the City of Baltimore. We believe, however, that the City Solicitor's representation of the BDC, under the circumstances, is one of the many characteristics of the interrelationship between the City and the BDC that indicates the latter is an instrumentality of the former for the purposes of the MPIA.