12 A.3d 144

**Reverend Daki NAPATA**

v.

**UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION.**

**No. 5, Sept. Term, 2010.**

Court of Appeals of Maryland.

Jan. 24, 2011.

726

Edward Smith, Jr. (Kerrie Campbell, Baltimore, MD), on brief, for petitioner.

Scott R. Haiber (Mark D. Gately and Katherine A. Cooper of Hogan & Hartson LLP, Baltimore, MD), on brief, for respondent.

Argued before HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

ADKINS, J.

In this case we must determine the limits of Maryland's Public Information Act ("PIA").[1] Petitioner Reverend Daki Napata sought access to certain records controlled by Respondent University of Maryland Medical System Corporation ("UMMS"). UMMS denied his request on grounds that it is not an "agency or division of the State of Maryland" and thus not subject to the PIA. Napata then appealed to the Circuit Court for Baltimore City for assistance, but was unsuccessful, and the Court of Special Appeals later affirmed the trial court's judgment. We granted Napata's Petition for Writ of Certiorari to answer the following question:

Did the lower court err in holding that Maryland Annotated Code of Education Article, Section 13–303 states that Respondent is not an instrumentality of the State of Maryland?

We shall hold that, although UMMS is an "instrumentality of the State" for purposes of the PIA, an express exemption from laws affecting only governmental or public entities located in the corporation's enacting statute shields it from the

---

1. The Maryland Public Information Act is contained in Section § 10–611 *et seq.*, Maryland Code (1984, 2009 Repl.Vol.), § 10–611 *et seq.* of the State Government Article ("SG").

public information law. Thus, we affirm the decision of our intermediate appellate court.

## FACTS AND LEGAL PROCEEDINGS

The events in this case are simple and uncontested. Of a greater importance to us is the larger history of UMMS. Thus, before setting forth the facts specific to this dispute, we will provide a brief overview of the corporation.

### I. The University Of Maryland Medical System

UMMS's beginnings can be traced back to the University of Maryland (the "University"), and the hospital system that it operated. The University, as an instrumentality of the State,[2] was subject to those laws affecting government and public entities, including the PIA. Adherence to numerous state regulations, however, proved to be financially burdensome for the University hospital, especially because it relied upon "patient fees for support and receive[d] no state operating or capital funds." University of Maryland Medical System, Office of Public Affairs, *Questions and Answers for Employees About The University Of Maryland Medical System's Governance Change* (on file with the Maryland State Law Library). *See also* Governance Chronology, S. 481, 387 Sess. (1984) (explaining that in 1977, the "Appropriations Committee of the Maryland House of Delegates decided to gradually phase out general fund support for both operations and capital for the University of Maryland Hospital.") According to the General Assembly,

> [i]t [had] proven unnecessarily costly and administratively cumbersome for the University to finance, manage, and carry out the patient care activities of an academic institution within the existing framework of a State agency, since

---

**2.** The law clearly recognizes the University as an instrumentality of the State. *See* Md.Code (1978, 2008 Repl.Vol.), § 12–102(a)(2) of the Education Article ("The University is an instrumentality of the State and a public corporation."); *see also Pearson v. Murray*, 169 Md. 478, 481, 182 A. 590, 591 (1936) ("That [the University] is an instrumentality or agency of the State is plain[.]").

many applicable laws, management structures, and procedures were developed to implement types of governmental functions which differ from the operations of a major patient care facility in an environment of State and federal regulation[.]

*See* Md.Code (1978, 2008 Repl.Vol.), § 13–302(5) of the Education Article ("Ed."). The General Assembly also remarked that "patient care operations are more efficiently served by contemporary legal, management, and procedural structures utilized by similarly situated, private entities throughout the nation[.]" *Id.*

As a result, Maryland's legislature sought to "separate the operations, revenues, and obligations of the medical system from the State[.]" Ed. § 13–302(6). It formed UMMS, a "private, nonprofit, nonstock corporation[.]" Ed. § 13–301(m). The General Assembly transferred all University medical system[3] assets, as determined by the Board of Public Works, to UMMS. Ed. § 13–307(a). In exchange for the assets, UMMS assumed the University medical systems' liabilities to the extent provided in the statute or in the annual contract between UMMS and the University. *See* Ed. § 13–308(a).

UMMS's mission was "to provide medical care of the type unique to University medical facilities for the citizens of the State and region and, in accomplishing this objective, to provide a clinical context for education and research conducted by the faculty of the University[.]" Ed. § 13–302(1). Moreover, UMMS was to "render[ ] comprehensive health care to the community naturally served by University Hospital to assure its availability to citizens of that community[.]" Ed. § 13–302(3). "These purposes separately and collectively

---

**3.** At the time of transfer, the "medical system" consisted of

those health care delivery components of the University that are in Baltimore City rendering patient care services and more particularly identified by the Board of Public Works at the time of conveying medical system assets to [UMMS], including University Hospital, the University Cancer Center, and the clinical component of the [Maryland] Institute [for Emergency Medical Services Systems].

Ed. § 13–301(k).

serve the highest public interest and are essential to the public health and welfare[.]" Ed. § 13–302(4).

Although the General Assembly created a separate corporate entity, it did not relinquish all control of UMMS. The corporation could not exist until its Articles of Incorporation were approved by the Board of Public Works. *See* Ed. § 13–303(a)(1). Additionally, all voting members on UMMS's Board of Directors are appointed by the Governor, two of whom must be members of the General Assembly and nominated by the President of the Senate and Speaker of the House of Delegates, respectively. *See* Ed. § 13–304(b) & (c)(3). The Governor also fills any vacancies on the Board. *See* Ed. § 13–304(d)(4).

UMMS must also submit annual contracts to the University's Board of Regents. *See* Ed. § 13–306(a). These contracts set forth "all financial obligations, exchanges of services, and any other agreed relationships between the University and [UMMS] for the ensuing fiscal year." *Id.* Furthermore, UMMS must annually file audited financial statements with the Governor, the Joint Audit Committee, and University Board of Regents. *See* Ed. § 13–303(g). UMMS may request grants from the General Assembly only after approval by the University Regents, *see* Ed. § 13–303(i), and the State Treasurer may loan funds to UMMS, if funds have been appropriated in the annual State budget, only with approval from the Board of Public Works, *see* Ed. § 13–309. UMMS must also "coordinate with [the] University [any] fundraising efforts[,] all [UMMS] campaigns and solicitations for private gifts[,] and proposals for private or federal grants." Ed. § 13–303(j).

Finally, if the University Regents and the Board of Public Works determine that UMMS has failed to realize the purposes set forth in its enacting statute, they have the power to terminate UMMS. *See* Ed. § 13–311(c). Upon dissolution, and after any outstanding debts have been satisfied, all remaining UMMS assets revert to the State. *See* Ed. § 13–311(b).

## II. Napata's Request For UMMS Records

Following the racketeering conviction of former State Senator Thomas Bromwell for his role in influencing the awarding of a UMMS construction contract,[4] Petitioner Napata sought access to the UMMS records relating to that contract. UMMS denied his request, explaining that its business records "are not subject to disclosure under the Maryland Public Information Act" because UMMS is a "private, non profit corporation and *not* an agency or division of the State of Maryland." (Emphasis in original).

In response, Napata filed this action. He appeared before the Circuit Court for Baltimore City on two separate motions, and was unsuccessful both times. The first involved his own Motion for Summary Judgment, which the judge denied on the grounds that the PIA did not apply to UMMS because the General Assembly intended "to separate [UMMS] from the ties to the University and the state which subjected it to the public scrutiny and bureaucratic processes which formerly obstructed its growth." A little over a month later, a different judge adopted similar reasoning when granting UMMS's Motion to Dismiss. She concluded that UMMS "is not[,] pursuant to the statute[,] an instrumentality of the State and therefore, not subject to the [PIA]."

Napata appealed the Circuit Court's dismissal of his case to the Court of Special Appeals. Following a thorough analysis,

---

**4.** According to the United States Attorney's Office, in exchange for payment and other benefits, Bromwell used his official position and influence to intervene in business disputes on behalf of Poole and Kent Corporation (P & K), including helping P & K to "win a multi-million dollar bid over a competitor with a lower bid, and thereby earn a $1.8 million profit, on the construction of the University of Maryland Medical System (UMMS) Weinberg Building in downtown Baltimore[.]" Press Release, United States Attorney's Office for the District of Maryland, *Former State Senator Thomas Bromwell Sentenced To 7 Years On Charges Of Racketeering Conspiracy And Filing A False Tax Return* (Nov. 16, 2007) (available at http://www.justice.gov/usao/md/Public-Affairs/press_releases/press07/FormerStateSenatorThomasBromwell Sentencedto7YearsonChargesofRacketeeringConspiracy.html). On November 16, 2007, a federal district court judge sentenced Bromwell to seven years in prison. *Id.*

the Court affirmed the lower court's decision, but for different reasons. While it agreed with Napata that UMMS was an instrumentality of the State, the intermediate appellate court concluded that UMMS was exempt from the PIA because the entity's enacting statute expressly provided that the corporation was not subject to laws affecting only governmental or public entities. The Court interpreted the PIA as one of these laws. Napata then petitioned this Court for a writ of certiorari, which we granted. *See Napata v. UMMSC,* 411 Md. 740, 985 A.2d 538 (2009).

## DISCUSSION

### I. Standard of Review

The role of an appellate court is substantially similar whether reviewing the grant of summary judgment or the grant of a motion to dismiss. In both instances, the standard is whether the trial court was "legally correct." *Compare Eng'g Mgmt. Servs. v. Md. State Highway Admin.,* 375 Md. 211, 229, 825 A.2d 966, 976 (2003) ("The standard for appellate review of a summary judgment is whether it is 'legally correct.' ") *with Sprenger v. Public Serv. Comm'n.,* 400 Md. 1, 21, 926 A.2d 238, 250 ("When reviewing the grant of a motion to dismiss, an appellate court is concerned with determining whether the trial court was legally correct."). Moreover, with regard to both types of motions, "we accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Sprenger,* 400 Md. at 21, 926 A.2d at 249 (motion to dismiss). *See also Reiter v. Pneumo Abex,* 417 Md. 57, 67, 8 A.3d 725, 731 (2010) (same for grant of summary judgment). The facts of the underlying action are uncontested. Thus, we are simply tasked with a *de novo* review of the Circuit Court's conclusions of law. *See Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.,* 388 Md. 500, 509, 880 A.2d 307, 312 (2005) (motion to dismiss); *Reiter,* 417 Md. at 67, 8 A.3d at 731 (summary judgment).

## II. Analysis

 The PIA governs access to public records. *See* Maryland Code (1984, 2009 Repl.Vol.), § 10–611 *et seq.* of the State Government Article ("SG"). Under the Act, "[e]xcept as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time." SG § 10–613(a)(1). The PIA defines a "public record" as "any documentary material" that "is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business. . . ." SG § 10–611(g). Furthermore, a "custodian" is either "the official custodian" or "any other authorized individual who has physical custody and control of a public record." SG § 10–611(c). It follows from these three provisions that the reach of the PIA is limited to (1) "custodians" of the records or (2) organizations that are units or instrumentalities of the State or political subdivisions, that are not otherwise shielded from the PIA by law. Thus, to determine whether UMMS had an obligation, under the PIA, to provide the requested records to Napata, we will first address whether UMMS is a unit or instrumentality of the State. If we determine that it is an instrumentality, we must then ascertain whether UMMS is otherwise exempt from the PIA by law.

### A. Unit Or Instrumentality Of The State

 This Court has repeatedly announced that there is no single test for determining whether an entity is a unit or instrumentality of the State. *See A.S. Abell Publishing Company v. Mezzanote*, 297 Md. 26, 35, 464 A.2d 1068, 1072 (1983). Rather, "[a]ll aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status." [5] *Id.* Courts must consider a

---

**5.** UMMS would have us abandon this comprehensive analysis for a simple lexical exercise. It relies on the interchangeability of the terms "instrumentality" and "agency" to support its argument that, when the General Assembly declared that UMMS would "not be a State agency,

number of factors, including the degree of control exercised by the State over the entity. *Id.* Yet, "complete control—control over all aspects of an entity's operation—is not a determinative factor in characterizing a statutorily-established entity as an agency or instrumentality of the State." *Id.*

We emphasized the importance of examining all aspects of the government-entity relationship for purposes of the PIA in *City of Baltimore Development Corporation v. Carmel Realty Associates,* 395 Md. 299, 910 A.2d 406 (2006). There, we rejected the assertion that the City of Baltimore Corporation (the "BDC"), a not-for-profit real-estate development corporation, was not subject to the PIA simply because it was not a statutorily-created entity. *Id.* at 334–35, 910 A.2d at 427–28. Instead, we favored a more comprehensive analysis. *Id.* We concluded that the following aspects of the BDC's relationship with the City of Baltimore made it an instrumentality of the City:

> The BDC's Board of Directors, to include the Chairman of the Board, are nominated or appointed by the Mayor of Baltimore; he has the power to remove members of the Board before their four year terms are up; the Mayor also has the power to fill vacancies; the City's Commissioner of the Department of Housing and Community Development and the City's Director of Finance are permanent members of the Board; the BDC receives a substantial portion of its budget from the City; the BDC has a tax exempt status under the Internal Revenue Code; pursuant to the City's contract with the BDC, if it should cease to exist, the City

political subdivision, public body, public corporation, municipal corporation[,]" Ed. § 13–303(a)(2), it meant that UMMS was not an instrumentality of the State. Yet, unlike § 9–401(f) of the Environment Article cited by UMMS, which defines "Federal agency" as, among other things, any "instrumentality of the United States[,]" we cannot find any evidence that the General Assembly intended the same definition for the term "State agency" as used in a wholly separate article. Moreover, the terminology used to describe the relationship is not controlling. We look instead to the attributes of the relationship. *Cf. Green v. H & R Block, Inc.,* 355 Md. 488, 503, 735 A.2d 1039, 1048 (1999) (listing the three fact-specific characteristics of an agency relationship, none of which is the label assigned by the parties).

would control the disposition of the BDC's assets; BDC is also authorized to prepare and adopt Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones which are traditionally governmental functions.

*Id.* at 335, 910 A.2d at 428. We also viewed the purpose behind the BDC's formation as indicative of this status:

[T]he BDC was formed to plan and implement long range development strategies throughout the City of Baltimore [on] behalf of the City of Baltimore; to implement, oversee, and encourage development that will increase the City's tax base; to provide jobs in the City; to enhance and improve the physical and cultural environment of the City; to improve the economic health of the City; and to be responsible for Urban Renewal Plans, Planned Unit Developments, Industrial Retention Zones, and Free Enterprise Zones on behalf of the City.

*Id.* at 334, 910 A.2d at 427.

We applied the same test to a Maryland city's hospital after it denied a newspaper reporter's PIA request,[6] with similar results. In *Moberly v. Herboldsheimer,* 276 Md. 211, 345 A.2d 855 (1975), we held that Memorial Hospital of Cumberland, a corporation, was "an agency of the City of Cumberland" because of the hospital's close relationship to the city and its creation "for municipal purposes[.]" *Id.* at 225, 345 A.2d at 862–63. Cumberland bonds financed the hospital's construc-

---

**6.** At the time of *Moberly v. Herboldsheimer,* 276 Md. 211, 345 A.2d 855 (1975), the PIA was codified in Md.Code (1957, 1975 Repl.Vol.), Art. 76A, § 1. Subsection (a) of that section provided in part:

The term 'public records' when not otherwise specified shall include any paper, correspondence, form, book, photograph, photostat, film, microfilm, sound recording, map drawing, or other document, regardless of physical form or characteristics, and including all copies thereof, that have been made by the State and any counties, municipalities and political subdivisions thereof and *by any agencies of the State, counties, municipalities, and political subdivisions thereof,* or received by them in connection with the transaction of public business, except those privileged or confidential by law.

Md.Code (1957, 1975 Repl.Vol.), Art. 76A, § 1(a) (emphasis added).

tion, and both the Mayor and the President of the Board of County Commissioners of Allegany County sat on the hospital's Board of Governors. *Id.* at 214–15, 345 A.2d at 857. Moreover, the Board of Governors could not increase its capital account without the permission of both the Mayor and City Council of Cumberland. *Id.* at 224, 345 A.2d at 862. If the hospital suffered from a deficit, the Mayor and City Council could appropriate the necessary funds for the hospital. *Id.* Conjointly, the hospital was to donate any profits to the City's "Sinking Fund." *Id.* These factors, taken together, were enough to satisfy the PIA's agency requirement.

Two other cases are analogous to this one, and in both, the entity was determined to be an instrumentality of the State for purposes of the PIA. In *Andy's Ice Cream, Inc. v. City of Salisbury,* 125 Md.App. 125, 136, 724 A.2d 717, 722 (1999), an unsuccessful contract bidder claimed that, pursuant to the PIA, the Salisbury Zoo Commission was required to disclose the grounds for its bid decision. The Zoo Commission's members were appointed by the Mayor and City Council of Salisbury, who could also dissolve the Zoo Commission at will. *Id.* at 142, 724 A.2d at 725. Moreover, the "Zoo Commission [had to] receive the City's approval before altering its own By–Laws or making "major departures" from its budget." *Id.* Likewise, in *Mezzanote,* 297 Md. 26, 464 A.2d 1068, a reporter sought to inspect certain records of the Maryland Insurance Guaranty Association ("MIGA") under the PIA. An examination of MIGAs' operations showed that

MIGA's existence depend[ed] upon the General Assembly; it serve[d] a public purpose, its management [was] selected by the Commissioner, and [was] not self-perpetuating; it [did] not independently manage its affairs or enforce its regulations; its decisions [could] be reversed by the Commissioner; and it enjoy[ed] a special tax and liability status.

*Id.* at 38–39, 464 A.2d at 1074.

Turning to the case at hand, we agree with the Court of Special Appeals that "the attributes of UMMS's relationship with the State that point to its being an instrumentality of the

State predominate over those pointing to its private character, for purposes of the corporation's inclusion in the scope of the PIA." UMMS did not exist until the State assets were transferred to the corporation. Its aim of providing health care to the local community, as well as a teaching hospital to University students, and Maryland residents serves a public purpose. Moreover, the State remains a visible and compelling force in UMMS's operations. All voting members on UMMS's Board of Directors are appointed by the Governor,[7] and two of these flow from nominations by the respective leaders of each legislative chamber.[8] Additionally, unlike an independent hospital, UMMS is not free to compete with the University for private gifts or private or federal grants, and its annual contracts must be approved by the Regents of the University. Should UMMS become financially unstable, the Treasurer may loan State funds to UMMS as necessary. Finally, the Regents and the Board of Public Works have the power to dissolve UMMS if they determine that it is not fulfilling its purpose. In that event, UMMS's assets will revert to the State. These facts compel the conclusion that UMMS is an instrumentality of the State.

### B. Except As Otherwise Provided By Law

 Notwithstanding its status as a state instrumentality, we should not conclude that UMMS is subject to the PIA without considering the exemption set forth in Ed. § 13–303(a)(2), the state law authorizing the creation of UMMS. This exemption provides that UMMS "shall not be a State agency, political subdivision, public body, public corporation or

---

**7.** The same authority was given to the Commissioner in *Mezzanote* and the respective mayors in *Carmel Realty* and *Andy's Ice Cream. See Mezzanote*, 297 Md. at 32, 464 A.2d at 1071; *Carmel Realty*, 395 Md. at 335, 910 A.2d at 428; *Andy's Ice Cream*, 125 Md.App. at 132–33, 724 A.2d at 720–21.

**8.** This is similar to the governing boards in *Carmel Realty, Moberly*, and *Andy's Ice Cream*, which were comprised, in part, by government officials. *See Moberly*, 276 Md. at 214–15, 345 A.2d at 856–57; *Carmel Realty*, 395 Md. at 335, 910 A.2d at 428; *Andy's Ice Cream*, 125 Md.App. at 132–33, 724 A.2d at 720–21.

municipal corporation and **is not subject to any provisions of law affecting only governmental or public entities."** *Id.* (Emphasis added). Thus, UMMS will be exempt from the PIA if we conclude that the PIA is a law that affects only governmental or public entities.

Considering this question, we turn to the text of the statute—the PIA governs records "made by a unit or instrumentality of the State[.]" SG § 10–611(g). Like the Court of Special Appeals, we cannot "distinguish the 'instrumentality' of State government, that is the limit of the reach of the PIA, from a 'public entity,' that is the reach of the UMMS exemption." As we see no meaningful distinction between these two terms, for purposes of these statutes they are synonymous.[9] Accordingly, the general exemption UMMS enjoys by virtue of Ed. § 13–303(a)(2) includes exemption from the requirements of the PIA.[10]

Napata contests this logic, arguing that exempting UMMS from the reach of the PIA conflicts with the purposes of that Act, which, according to Napata, is providing the public with "broad access to information concerning the operation of governmental instrumentalities." Yet, as Respondent argues, the purpose of the corporation's statutory exemption is to "liberat[e] UMMS from the burdens placed on government agencies." We have previously described how two seemingly inconsistent statutes can be reconciled:

> Even though two statutes may require conflicting results with regard to their common subject, they are not thereby

**9.** Under our analysis, a private entity that contracts with the State to store records on the State's behalf would be an "authorized individual who has physical custody and control of a public record" (i.e. a physical custodian). *See* SG § 10–611(c) (defining "custodian"). Thus, it would be a "public entity" or "state instrumentality," but only in that capacity. In other words, such a storage facility must comply with the PIA insofar as any request pertains to those government records. Its own unrelated records are not subject to the PIA.

**10.** We need not determine whether the PIA is a law affecting only governmental entities. *See* Ed. § 13–303(a)(2) (exempting UMMS from any laws "affecting only governmental **or** public entities.").

necessarily rendered irreconcilable. Where provisions of one of the statutes deal with the common subject generally and those of the other do so more specifically, the statutes may be harmonized by viewing the more specific statute as an exception to the more general one.

*Government Employees Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 132–33, 630 A.2d 713 (1993). Here, the PIA generally applies to instrumentalities or units of the State, whereas UMMS's enacting statute pertains specifically to UMMS. It follows, then, that the UMMS statute is an exception to the PIA. Indeed, the PIA expressly builds in this exception: "*Except as otherwise provided by law,* a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time." SG § 10–613(a)(1) (emphasis added). Thus, UMMS is shielded from the PIA.

■ Recent legislative history is consistent with our decision. In 2007, the General Assembly rejected a Senate bill that would have amended Ed. § 13–303 to include new language that "[UMMS] shall be subject to the provisions of the Maryland Public Information Act. . . ." Senate Bill 911, 423rd Sess. (Md.2007). The stated purpose of the bill was to make "[UMMS] subject to certain provisions of State law relating to access to public records. . . ." *Id.* Although a failed statutory amendment "is not an infallible indicator of legislative intent[,]" *Andy's Ice Cream*, 125 Md.App. at 154, 724 A.2d at 731, we have indicated that "such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted." *State v. Bell*, 351 Md. 709, 721, 720 A.2d 311, 317 (1998) (*quoting Demory Bros. v. Bd. Of Pub. Works*, 273 Md. 320, 326, 329 A.2d 674, 677 (1974)).

## CONCLUSION

The State's sustained oversight of UMMS reveals that the corporation is an instrumentality of the State for purposes of the PIA. UMMS, however, is not subject to the public information law because its enacting statute expressly exempts it

from laws affecting only public entities. Thus, UMMS was authorized to deny Napata's PIA request.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS OF THE RESPONDENT'S APPENDIX TO BE PAID BY THE RESPONDENT. ALL OTHER COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

