## PUBLIC INFORMATION ACT

UNITS OR INSTRUMENTALITIES – WHETHER GOVERNMENT-
 CREATED ADVISORY COMMITTEES ARE SUBJECT TO THE
 PUBLIC INFORMATION ACT

September 28, 2021

*The Honorable Paula Fudge*
*Chair, Town of Chevy Chase View Council*

You have asked for our opinion on the applicability of the Maryland Public Information Act (the "PIA") to government-created advisory committees, such as the Stormwater Management Committee that was formed by the Town of Chevy Chase View (the "Town") to, among other things, help identify problems associated with stormwater runoff in the Town and submit a report and recommendation on those issues to the Town Council. The PIA applies to all "public records" in the custody of any "unit" or "instrumentality of the State or of a political subdivision" of the State. Md. Code Ann., Gen. Prov. ("GP") § 4-101(j). Thus, your question is essentially whether a government-created advisory committee qualifies as a unit or instrumentality of the relevant State or local government for purposes of the PIA.

Although the decision as to whether an entity is subject to the PIA must be made on a case-by-case basis in light of the totality of the circumstances, an advisory committee that has been created by a State or local government to provide recommendations to the government about the government's public functions will very likely be a "unit" or "instrumentality" of that government. That is especially true when the government also controls the membership of the committee, has control over at least some other aspects of the committee's operations, and provides staff or other resources to the committee. Applying that standard to your specific question, the Town's Stormwater Management Committee (the "Committee") is unquestionably a "unit or instrumentality" of the Town under the PIA. Although it is our understanding that the Committee was recently dissolved once its work was completed, the Committee was created by the Town to provide advice about the Town's public functions, its membership was controlled by the Town, its actions remained subject to significant control by the Town, and its administrative support came from the Town.

# I
# Background

## A. *The Public Information Act*

The PIA "rests on the principle that '[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.'" 97 *Opinions of the Attorney General* 95, 97 (2012) (quoting what is now GP § 4-103(a)). Consistent with that principle, the statute governs access to all "public records," which are defined in relevant part as "any documentary material . . . made *by a unit or an instrumentality of the State or of a political subdivision* or received *by the unit or instrumentality* in connection with the transaction of public business." GP § 4-101(j) (emphasis added).[1] The PIA thus applies to any "unit or instrumentality" of the State or of a political subdivision of the State, unless that unit or instrumentality has been exempted by other law. *See, e.g.*, *Napata v. University of Md. Med. Sys. Corp.*, 417 Md. 724, 733-40 (2011) (concluding that the University of Maryland Medical System ("UMMS") was a "unit or instrumentality" under the PIA but was nonetheless exempt from the PIA because of a separate provision in the UMMS statute).

## B. *The Town of Chevy Chase View's Stormwater Management Committee*

Based on the information you have provided, the Town's Stormwater Management Committee was created in September of 2020 by formal action of the Town Council to "help identify and assess short and long-term problems associated with stormwater runoff in the Town, help discern the scope and nature of the problems, analyze the efficacy, costs, and benefits of possible solutions, and submit a report and recommendation to the Council." Council of Chevy Chase View, Minutes of Work Session on Stormwater Management Committee (Sept. 24, 2020) ("September Council Minutes"). The Council adopted a charter to govern the structure and functions of the Committee. *Id.* at 2; *see also* Town of Chevy Chase View, Stormwater Management Committee Charter (Sept. 24, 2020) ("Committee Charter"). According to that charter, the Committee was supposed to "remain in existence until

---

[1] As of October 1, 2021, this definition will be codified at GP § 4-101(k). *See* 2021 Md. Laws, ch. 62. Here, we will use the current citation, even though it is only current for a few more days.

it submits its report to the Council, not to exceed one year, but may be continued by the Council." Committee Charter at 1.

The Committee was to be composed of between five and nine members, appointed by the Town Council. September Council Minutes at 1-2; Committee Charter at 1. The members were "residents of the Town, who ha[d] an interest, time and/or special knowledge and skills to work on" the Committee. Committee Charter at 1. The members all served at the pleasure of the Town Council, and "[a]ny change to the composition of the Committee [had to] be approved by the Council." *Id.* In addition to these regular members, the Committee also had "one Council Member liaison and one Council Member alternate," who were not voting members, except that the liaison could "vote in order to break a tie vote." *Id.*

The duties of the Committee were set forth in the Committee's charter, as enacted by the Town Council. Those duties were:

> 1. To inventory the stormwater drainage facilities in the Town, and to help determine ownership and maintenance responsibilities.
>
> 2. To assist with an assessment of stormwater management problems and issues, assist with communications necessary to engage Town residents and produce one or more reports cataloging this effort. These report(s) [were required to] include, at a minimum, those issues where Montgomery County is responsible for solutions, where the Town is responsible for solutions, where private residents are responsible for solutions, and where integrated solutions are required.
>
> 3. To prioritize potential actions to solve the problems defined in item 2.
>
> 4. To recommend any changes in Town ordinances which may be beneficial in preventing, reducing or eliminating the negative impact from stormwater runoff.
>
> 5. To prepare a final report including the Committee's work and recommendations, to be given to the Council.

*Id.* at 1-2.

The Town also provided administrative support to the Committee. For example, the Town Manager was to "support the operations of the Committee and assist with the publication of meeting agendas and minutes, once they have been prepared by the Committee," and "[a]dditional assistance from the Town Manager" could be "sought by the Committee with the approval of the Council liaison." *Id.* at 2. The Committee could also submit a request to the Town Council for assistance by consultants, who would presumably have been paid by the Town. *Id.* at 1. In addition, with the approval of a majority of both the Committee and the Town Council, the Committee was permitted to "contact and communicate with County and State officials, Town residents, and others." *Id.* at 2.

Finally, the Town Council explicitly addressed the manner in which the Committee was to hold meetings and manage its records. As to meetings, the Committee's charter provided that it "should meet regularly and at least once a month" and that the meetings were to "be conducted in compliance with the Maryland Open Meetings Act." *Id.* Similarly, as to records, the charter required that the Town Manager "be copied on all correspondence to and from the Committee in order to maintain the public record" and mandated that the "[r]ecords of the Committee shall be retained in accordance with the Maryland Public Information Act." *Id.*

The Committee presented its final report and recommendations to the Town Council on July 27, 2021. *See* Council of Chevy Chase View, Work Session, Presentation of Stormwater Management Committee Final Report (July 27, 2021). Although not reflected in the minutes of the Council's July 27 meeting, we understand that the Committee was apparently dissolved following its final presentation, consistent with the expectation articulated in the Committee's charter that it would remain in existence until it submitted its report to the Town Council. *See* Committee Charter at 1; Town of Chevy Chase View, Town Committees, http://chevychaseview.org/wp/government/town-committees/ (last visited Sept. 10, 2021).

**II**
**Analysis**

You have asked for guidance about when an advisory committee, such as the Town's Stormwater Management Committee, qualifies as a "unit" or "instrumentality" of the State or of a political subdivision for purposes of the PIA. Apparently,

at least one member of the Committee has expressed doubts that the PIA applies to the Committee's records because the Committee did not itself perform any regulatory functions or itself exercise any government power.

We start, as always, with the language of the statute. *See, e.g.*, *Baltimore City Det. Ctr. v. Foy*, 461 Md. 627, 637 (2018). The PIA applies to any "unit" or "instrumentality of the State or of a political subdivision" of the State. GP § 4-101(j). That language is intentionally expansive. It covers not just all "unit[s]" of State or local government but also any "instrumentality" of the State or of a political subdivision, unless specifically exempted by other law. The word "instrumentality," in turn, is ordinarily understood to mean "[a] thing used to achieve an end or purpose" or "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 333 (2006) (quoting *Black's Law Dictionary* 814 (8th ed. 2004)); *see also id.* (noting that "instrumentality" can also mean a thing that serves as "a means, agent, or tool" (quoting *Merriam Webster's Collegiate Dictionary* 607 (10th ed. 1998))).

The language thus suggests that the PIA was intended to have broad reach. In fact, the PIA itself provides that its language must generally "be construed in favor of allowing inspection of a public record." GP § 4-103(b). And because the General Assembly has explicitly said that the provisions of the statute "must be liberally construed . . . in order to effectuate the [PIA's] broad remedial purpose" of ensuring public access to information about the affairs of government, *City of Baltimore Dev. Corp.*, 395 Md. at 333 (internal quotation marks omitted), the Court of Appeals has interpreted the already broad language of the PIA's scope provision especially broadly "in favor of inclusion," *A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 32 (1983).

Given the PIA's expansive language and the broad remedial purposes behind the statute, it is ordinarily the case that an entity created by the government will be subject to the PIA. The more difficult questions tend to arise when the government either creates an entity with significant private characteristics or imbues an ostensibly private entity with significant governmental characteristics. In such cases involving entities that are quasi-governmental (or, put another way, quasi-private) in nature, the Maryland courts have explained that "there is no single test for determining whether an entity is a unit or instrumentality" under the PIA and that, instead, "[a]ll aspects of the interrelationship

between the [government] and the . . . entity must be examined in order to determine its status." *Napata*, 417 Md. at 733; *see also* Letter from Robert N. McDonald, Chief Counsel for Opinions & Advice, to Sen. Joan Carter Conway (Oct. 4, 2007) ("Conway Letter").[2]

There are thus a number of factors that courts will examine to determine whether an entity qualifies as a "unit or instrumentality" of the government for purposes of the PIA. One important factor, as indicated above, is whether the entity has been created by the government. *See, e.g.*, *A.S. Abell Publ'g Co.*, 297 Md. at 35.[3] Another is whether the entity serves a "public purpose," *Napata*, 417 Md. at 737, or performs a "traditionally governmental function[]," *City of Baltimore Dev. Corp.*, 395 Md. at 335. Also relevant is the extent to which the entity is subject to government control, which could include whether the government appoints (or has the power to remove) the members of the entity's governing board, *see, e.g.*, *Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md. App. 125, 141 (1999); retains the power to dissolve the entity,

---

[2] In some cases, the General Assembly will specifically say that a particular entity is or is not an "instrumentality of the State." *See, e.g.*, Md. Code Ann., Hum. Servs. § 11-202(c) (specifically providing that the Maryland Legal Services Corporation is *not* a unit or instrumentality of the State). In those cases, the General Assembly's characterization will ordinarily govern. Conway Letter at 2. It is also possible for an entity to be governmental in nature for some purposes (or under some statutes) and not for other purposes (or under other statutes). *See, e.g.*, 98 *Opinions of the Attorney General* 114, 128-29 (2013). Here, we are merely focused on whether an entity would be a "unit" or "instrumentality" of the State under the PIA, a context in which the relevant terms have been construed especially broadly because of the "statutory mandate that the Public Information Act be liberally construed in order to effectuate its broad remedial purpose." *A.S. Abell Publ'g Co.*, 297 Md. at 39.

[3] But that factor is by no means dispositive. *See City of Baltimore Dev. Corp.*, 395 Md. at 335-36 (finding the Baltimore City Development Corporation to be an instrumentality of Baltimore City even though it was not created by law); Letter from Bonnie Kirkland, Assistant Attorney General, to Sen. Roy P. Dyson, at 1, 3-4 (Nov. 3, 2008) (advising that the St. Mary's Nursing Center was likely subject to the PIA even though it was not created by the government and had been incorporated as a private non-profit entity); *cf.* 63 *Opinions of the Attorney General* 106, 109 (1978) (finding Washington College to be a "private" institution, even though it was originally chartered by the General Assembly, for purposes of certain provisions in the Maryland Constitution).

*see, e.g.*, *Napata*, 417 Md. at 737; or otherwise controls at least some aspects of the entity's operations, *see, e.g.*, *A.S. Abell Publ'g Co.*, 297 Md. at 38 (noting that the entity's "plan of operation . . . [was] subject to [the government's] approval and amendment"); *Andy's Ice Cream*, 125 Md. App. at 141 (relying on the fact that the Mayor and City Council of Salisbury had veto power over many of the relevant entity's decisions). Finally, other factors can include whether the government provides funding, staffing, or other resources to the entity, *see, e.g.*, *City of Baltimore Dev. Corp.*, 395 Md. at 335;[4] has ex officio representation on the entity's board, *see, e.g.*, *Moberly v. Herboldsheimer*, 276 Md. 211, 215, 222-25 (1975); or has granted special tax exemptions or liability protections to the entity akin to the kind often afforded to governmental bodies, *see, e.g.*, *A.S. Abell Publ'g Co.*, 297 Md. at 38.

The most important factors in determining whether a quasi-governmental entity is subject to the PIA are usually "the degree to which the entity is controlled by the State or local government and the extent to which the entity performs what would otherwise be governmental functions." Conway Letter at 2. But the government need not have "complete control" over "all aspects of [the] entity's operation" for the entity to qualify as a government "instrumentality." *Napata*, 417 Md. at 734. The ultimate emphasis is "on the overall relationship between the entity and the State government or political subdivision[,] always remembering that the Legislature intended this statute to have a broad reach." *City of Baltimore Dev. Corp.*, 395 Md. at 335 n.26. We thus consider all of the relevant factors in light of the totality of the circumstances. *See, e.g.*, *Napata*, 417 Md. at 739-40 (concluding that UMMS was an instrumentality of the State, though exempt from the PIA under another statute); *City of Baltimore Dev. Corp.*, 395 Md. at 336 (finding the Baltimore Development Corporation to be subject to the PIA); *A.S. Abell Publ'g Co.*, 297 Md. at 39 (finding the Maryland Insurance Guaranty Administration subject to the PIA); *Moberly*, 276 Md. at 225 (finding the Board of Governors of the Memorial Hospital of Cumberland subject to the PIA); *Andy's Ice Cream*, 125 Md. App. at 141-42 (finding the Salisbury Zoo Commission subject to the PIA).

---

[4] The mere receipt of public funds, however, does not necessarily turn a private entity into a governmental one. *See, e.g.*, Md. Op. Att'y Gen. No. 96-011 (Feb. 29, 1996) (unpublished); Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Kevin Kelly, at 1-2 (Aug. 3, 2006) (concluding that a local volunteer fire department was likely not subject to the PIA even though it received public funding).

Those same factors may still be relevant in determining whether other types of entities are units or instrumentalities of the government under the PIA, even if they are entities that one would ordinarily think of as "governmental," rather than as quasi-governmental or quasi-private. *See* 86 *Opinions of the Attorney General* 94, 106 (2001) (concluding that a proposed police citizen review board would be subject to the PIA, because it would be "created pursuant to a City ordinance, it would perform a public function related to oversight of the City police department, and its budget and staff would be subject to the control of the City"). But when the entity in question cannot be characterized as quasi-governmental or quasi-private, the factors will generally be much easier to apply and even more likely to lead to a conclusion that an entity created by the government is a unit or instrumentality of the government. After all, the point of the factors is to gauge whether the "overall relationship" between the entity and the government is close enough to justify treating the entity as a unit or instrumentality of the government, *City of Baltimore Dev. Corp.*, 395 Md. at 335 n.26—a relationship that will ordinarily be easy to see when the government-created entity does not have any significant private characteristics. And an entity that is created by the government to help the government perform its public functions (and that does not have any characteristics of a private entity) would also seem to be an "instrumentality" of the government under the ordinary understanding of that term, that is, "[a] means or agency through which" the government's "function[s]" are "accomplished." *Id.* at 333.

Applying those factors, then, an advisory committee is very likely to be a "unit or instrumentality" under the PIA when it is created by the government to assist the government in performing its public functions. Although those two factors alone might be sufficient to answer the question in many cases, the advisory committee's status as a "unit or instrumentality" of the government will be especially clear when the government also controls the membership of the committee, maintains control over at least some of the committee's operations, can terminate or dissolve the committee, and provides funding or other kinds of support to the committee. That type of government-created advisory committee is a "unit or instrumentality" of government under the ordinary meaning of that phrase, *see id.*, and the broad remedial purposes behind the PIA reinforce that the records of such an advisory committee—which will presumably play an integral role in government decision-making—should be subject to public

inspection, at least to the extent otherwise permitted by law.[5] That conclusion is also consistent with prior advice from our Office, in which we concluded that an advisory board that had been created to help make decisions about the placement of speed cameras in Montgomery County was an instrumentality of the County for purposes of the PIA. *See* Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Alfred C. Carr (June 2, 2009).[6]

Although an advisory committee might not itself exercise any regulatory power or provide any government services, that does not mean it is not a "unit or instrumentality" of the government under the PIA. It is true that our Office has said that one of the most important factors in determining whether a quasi-governmental entity is subject to the PIA is if "the entity performs what would otherwise be governmental functions." Conway Letter at 2. But the question there involved whether entities with significant private characteristics were nonetheless instrumentalities of the government, not whether a government-created advisory committee would be. In this context, when an advisory committee has been created by the government to help that government exercise its functions, the relationship between the advisory committee and the government will typically be clearer. And, in any event, we do not read the reference to "governmental functions" in our prior advice to necessarily be limited solely to those functions that involve the actual exercise of governmental power. Rather, in articulating the relevant factor, the Court of Appeals has focused not just on whether the entity serves a "traditionally governmental function[]," *City of Baltimore Dev. Corp.*, 395 Md. at 335, but also on whether it serves a "public purpose," *e.g.*, *Napata*, 417 Md. at 737. Of

---

[5] Of course, some of the records held by an advisory committee will be protected from disclosure by various exemptions codified in the PIA, such as the deliberative process privilege. *See, e.g.*, GP § 4-344. And communications between individual members of the committee that do not involve the "transaction of public business"—such as emails that are personal in nature—would not be within the scope of the PIA. *See* GP § 4-101(j) (defining those "public record[s]" subject to the PIA). But that does not mean that the committee, as a whole, is exempt from the PIA.

[6] Although it was not clear from that advice letter whether the County government had created the advisory board at issue, the board was indeed created by an employee within the Montgomery County Police Department. *See* 9 *OMCB Opinions* 279, 280 (2015) (explaining the history of the advisory board in concluding that the advisory board was not a "public body" under the specific definition of that term in the Open Meetings Act, which differs from the meaning of "unit or instrumentality" in the PIA).

course, providing advice or recommendations to the government is not an *exclusively* public purpose. Private groups also make recommendations to the government all the time. But when the recommendations come from an entity that has been created by the government specifically to advise that government about the exercise of its functions, that advisory role becomes integral to the exercise of those governmental functions and, at the very least, serves a public purpose.

That is not to say that any group providing recommendations to the government automatically becomes a "unit or instrumentality" of the government subject to the PIA. When, for example, a clearly private entity (like the Chamber of Commerce or the American Civil Liberties Union) submits a recommendation to the government, that does not transform the entity into an instrumentality of the government. Or when citizens have organically come together on their own to form an advocacy group, the group is unlikely to be an instrumentality of the government, even if the government later asks for its advice (unless there are other indicia that suggest the government intended to turn the group into an instrumentality of the government).[7] We cannot address every hypothetical situation that might arise; whether the PIA applies to any particular entity has always been dictated by a multi-factor analysis and a good dose of common sense. But we suspect that an entity created by the government to provide that government with advice about how to exercise its public functions will, as a general rule, be a "unit or instrumentality" of the government under the PIA.

Based on that understanding, the Town's Stormwater Management Committee is unquestionably a "unit or instrumentality" of the Town. The Committee was created by the Town to study "stormwater management problems" within the Town and to provide recommendations to the Town about how to solve those problems, *see* Committee Charter at 1-2—matters that are clearly within the Town's public functions. The Town also controlled the membership of the Committee (by appointing its members and even retaining the power to remove those members

---

[7] Similarly, if a government official or employee asks individual members of the public for advice and then those individual people decide, by themselves, to discuss the matters with one another, that does not mean the government has created an advisory committee as we have been using that term here. Rather, we are focused here on government advisory committees that have been intentionally created to serve as such.

at will), *id.* at 1; had ex officio representation on the Committee, *id.* at 1; provided administrative staffing and support to the Committee, *id.* at 1-2; and maintained approval authority over when the Committee could "contact and communicate with County and State officials, Town residents, and others," *id.* at 2. The Town also retained the ability to dissolve the Committee, which was made clear when the Committee was apparently dissolved upon submission of its final report, as contemplated by the charter that created the Committee in the first place. *See* Committee Charter at 1. Although the Committee did not itself exercise governmental power, it was a tool that the Town created to help the Town perform its public functions regarding stormwater management and to achieve its governmental purposes. The Committee's "public records" are thus subject to the PIA. GP § 4-101(j).

### III
### Conclusion

In sum, a government-created advisory committee, like the Town's Stormwater Management Committee, is very likely to be subject to the PIA when created by the government to advise the government as to its public functions, although the decision as to any particular committee must ultimately be made on a case-by-case basis. Other factors, such as whether the government maintains control over the membership of the committee and over other aspects of the committee's operations, may also be relevant to the determination. But even if an advisory committee does not itself exercise the sovereign power of the government, it can still be a "unit or instrumentality" of the government for purposes of the PIA.

Brian E. Frosh
Attorney General of Maryland

Patrick B. Hughes
Chief Counsel,
  Opinions and Advice